[No. B024603. Second Dist., Div. Two. Dec. 10, 1987.]

CLAUDIA KRIKORIAN, Cross-complainant and Appellant, v. HELENA BARRY, Cross-defendant and Respondent.

**COUNSEL**

Allen & Allen, David L. Allen and Malcolm Venolia for Cross-complainant and Appellant.

Jaret, Caudill & Kuehn and O. Brandt Caudill, Jr., for Cross-defendant and Respondent.

## OPINION

### FUKUTO, J.—

#### INTRODUCTION

Cross-complainant, Claudia Krikorian, appeals from an order sustaining the demurrer of cross-defendant, Helena Barry, to the fourth and fifth causes of action of the cross-complaint, without leave to amend.

#### STATEMENT OF FACTS

Claudia Krikorian (appellant) is the owner and operator of two pre-schools providing instruction and day care to children two and one-half to five years of age: Peninsula Montessori School No. 1 (PMS No. 1) and Peninsula Montessori School No. 2 (PMS No. 2). A lawsuit was filed on behalf of nine students alleging that the children had been sexually molested by appellant and school personnel while attending school. Appellant cross-complained against Melissa W., the parent of one of the plaintiff-students, Dr. Denise Godfrey-Pinn, and Dr. Helena Barry, a licensed clinical psychologist (respondent).

The cross-complaint stated six causes of action. Only three causes of action named respondent as a cross-defendant. In the fourth cause of action for professional negligence, the complaint alleged that respondent had been engaged by the parents of various children "to render psychotherapeutic services . . . to determine whether the children had been sexually abused, and, if so, to alleviate any negative psychological effects upon the children caused by the sexual abuse." It was further alleged that in the treatment of each child, respondent "performed at least one of the following negligent acts or omissions: [¶] (a) Questioning the children about the identities of their alleged abusers by showing them 'anatomically correct' dolls with genitalia while simultaneously telling the children that these dolls represented [appellant's employees]; [¶] (b) Allowing and encouraging the children to demonstrate purported acts of sexual abuse through play with the . . . 'anatomically correct' dolls; [¶] (c) Exhibiting unquestioning belief of all stories no matter how improbable, told by the children in the course of their therapy concerning purported acts of sexual abuse allegedly performed by staff members at PMS No. 1 and PMS No. 2; [¶] (d) Asking each child leading questions about the identities of people suspected of sexually abus-ing him or her, including questions mentioning the names . . . [of appellant and her employees]; [¶] (e) Introducing into each child's therapy sessions questions concerning sexual abuse based upon information provided by people other than the children themselves, including but not limited to: the

parents of each child, employees of the Lomita Sheriff's Department, and employees of Harbor-UCLA Medical ·Center; [¶] (f) Refusing to accept as truthful statements made by each child during the course of therapy that he or she had never been abused by any person employed at PMS No. 1 or PMS No. 2." According to the cross-complaint, respondent's negligent acts and omissions caused the children to "make false accusations that acts of child abuse had been committed by [appellant] and her employees," which were "reported to the California Department of Social Services by Cross-defendants GODFREY-PINN and [respondent], thereby occasioning the Department's decision to revoke [appellant's] license to operate PMS No. 1 and its decision to deny [appellant's] application for a license to operate PMS No. 2."

In the fifth cause of action for intentional infliction of emotional distress, it was alleged that the named students of PMS No. 1 and PMS No. 2 "were initially referred to Cross-defendants GODFREY-PINN and [respondent] by employees of the Lomita Sheriff's Department." Commencing on May 1, 1984, respondent and Godfrey-Pinn were allegedly "engaged in a conspiracy with the Lomita Sheriff's Department, the California Department of Social Services, and the Harbor-UCLA Medical Center to deprive [appellant] of her property without due process of law by fabricating evidence that [appellant] and her employees . . . had sexually abused students at PMS No. 1 and PMS No. 2." It was asserted, inter alia, that the acts of Godfrey-Pinn and respondent "were intentional and malicious and done for the purpose of causing [appellant] to suffer humiliation, mental anguish and emotional distress."[1]

In response to appellant's cross-complaint, respondent demurred to the fourth and fifth causes of action on the ground that respondent's conduct was absolutely privileged under the Child Abuse Reporting Act (Pen. Code, § 11165 et seq.). Under authority of *Storch* v. *Silverman* (1986) 186 Cal.App.3d 671 [231 Cal.Rptr. 27], the trial court granted the demurrer without leave to amend. This appeal followed.

## THE ISSUE

Penal Code Section 11166[2] imposes upon all child care custodians, medical and nonmedical practitioners, and employees of child protective agen-

---

[1] In the sixth cause of action, appellant sought $25 million in compensatory damages for violation of civil rights. This cause of action contained allegations that respondent's conspiratorial behavior had deprived appellant of property, to wit, her licenses to operate PMS No. 1 and PMS No. 2, without due process of law. The parties stipulated that respondent's demurrer to the sixth cause of action could be granted without leave to amend.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

cies and commercial film and photographic print processors, a compulsory obligation to report suspected instances of child abuse to a child protective agency. The failure to report is a misdemeanor, punishable by up to six months in jail or by a fine of $1,000, or both. (§ 11172, subd. (e).) Section 11172, subdivision (a) provides that those subject to the mandatory reporting requirement of section 11166 shall not be "civilly or criminally liable for any report required or authorized by [that section]." In *Storch* v. *Silverman, supra,* 186 Cal.App.3d 671, the Court of Appeal recently construed subdivision (a) of section 11172 as granting designated mandatory reporters *absolute* immunity from civil liability for reporting a suspected case of child abuse to a child protective agency. (*Id.* at p. 675.) Appellant invites us to repudiate *Storch* v. *Silverman* to the extent it interprets section 11172 as conferring absolute liability upon medical and nonmedical practitioners, and other persons upon whom the duty to report child abuse is imposed, for malicious or false reports of child abuse. We decline the invitation and affirm the order granting respondent's demurrer without leave to amend.

## DISCUSSION

### *Absolute Immunity for Mandatory Reporters for Malicious and False Child Abuse Reports*

The disputed immunity provision of section 11172, subdivision (a), states: "No child care custodian, medical practitioner, nonmedical practitioner, employee of a child protective agency or commercial film and photographic print processor who reports a known or suspected instance of child abuse shall be civilly or criminally liable for any report required or authorized by this article." ■■■ Appellant contends that, since a report is neither "required" nor "authorized" by statute unless the reporting party "knows or reasonably suspects" that child abuse has occurred (§ 11166), only reports supported by actual knowledge or reasonable suspicion of child abuse are immunized by statute. Ergo, it was error as a matter of law to grant respondent's demurrer since the complaint, liberally construed, alleged that respondent's report of suspected child abuse was false and malicious, and therefore *not* based upon actual knowledge or reasonable suspicion that appellant and her employees had sexually abused students of PMS No. 1 and PMS No. 2.

The identical argument was advanced and soundly rejected in *Storch* v. *Silverman.* The Court of Appeal reviewed the legislative history of sections 11166 and 11172 and concluded that "the Legislature intended that those required to report suspected cases of child abuse would be absolutely immune from liability." (186 Cal.App.3d at p. 679.) We find ample support in

the history of the Child Abuse Reporting Act to support this conclusion. A brief summary of the legislative history of mandatory child abuse reporting is illustrative.

Prior to the enactment of the 1980 Child Abuse Reporting Act, a statutory duty was imposed upon enumerated professionals[3] to report injuries of a minor which appeared, "from observation of the minor" to have been inflicted by other than accidental means, as well as apparent cases of sexual molestation, willful cruelty, unjustifiable punishment or child endangerment. (See former § 11161.5, subd. (a); § 273a.) The failure to report child abuse was a misdemeanor punishable by imprisonment in the county jail not exceeding six months or by a fine not exceeding $500, or by both. (Former § 11162.) Mandatory reporters could be held civilly or criminally liable for false reports of child abuse only if the reporting party "knew or should have known that the report was false." (Former § 11161.5, subd. (a).) Complete immunity was otherwise provided.

Existing measures to promote reporting of child abuse proved inadequate. The Supreme Court, in *Landeros* v. *Flood* (1976) 17 Cal.3d 399 [131 Cal.Rptr. 69, 551 P.2d 389, 97 A.L.R.3d 324], characterized the mandatory reporting provision of section 11161.5 as "ambiguous with respect to the required state of mind of the physician." (*Id*. at p. 415.) The pre-1980 law was construed as imposing criminal liability for the failure to report child abuse only upon proof that the mandatory reporter "actually observed [the] injuries and formed the opinion they were intentionally inflicted. . . ." (*Ibid*.) Professionals were deterred from reporting suspected cases of child abuse absent personally observed physical evidence of nonaccidental injury because of the ambiguity in the reporting standard and fear of civil liability resulting from a report which subsequently proved false. (See State Bar of Cal., Rep. on Assem. Bill No. 2497 (1979-1980 Reg. Sess.) p. 2; Assem. Bill No. 2497 (1979-1980 Reg. Sess.) approved by Governor, Aug. 30, 1980, Assem. Final Hist. (1979-1980 Reg. Sess.) p. 1467; Hearing on Child Abuse Reporting before the Assem. Com. on Criminal Justice (1977-1978 Reg. Sess.) Nov. 21, 1978, pp. 16-18.)

At a November 1978 hearing on child abuse reporting before the Assembly Committee on Criminal Justice, an official of the State Department of

---

[3] Persons subject to the duty to report included: physicians, surgeons, dentists, residents, interns, podiatrists, chiropractors, marriage, family and child counselors, psychologists, religious practitioners, registered nurses, school superintendents, supervisors of child welfare and attendance, school principals, teachers, licensed day care workers, administrators of public or private summer day camp or day care centers, social workers, peace officers, probation officers, and "certificated pupil personnel employee[s]." (Former § 11161.5.)

Justice testified that, despite the enactment of a mandatory child abuse reporting law, as few as 10 percent of all cases of child abuse were being reported to responsible government agencies. (Hearing before the Assem. Com. on Criminal Justice on Child Abuse Reporting, *supra*, p. 7.) In a report on proposed child abuse reporting legislation, the State Bar of California wrote: "The seriousness of the problem of child abuse cannot be over estimated. Repeated instances of abuse of the same child tend to lead to progressively more severe results, including death, brain damage, and disabling emotional handicaps. It's not a tiny fraction of the child population we're talking about, either. Approximately 10% of all trauma seen in emergency rooms affecting children under three years of age is inflicted. [Fn. omitted.] Of all fractures in children under two years of age, 25% are inflicted. [Fn. omitted.] Studies show reinjury rates *after* initial abuse run as high as 50% to 60%. [Fn. omitted.]" (State Bar of Cal., Rep. on Assem. Bill No. 2497, *supra*, p. 2.)

The Child Abuse Reporting Act of 1980, and subsequent amendments, comprised the Legislature's attempt to rectify the problem of inadequate child abuse reporting. (See § 11165 et seq.; Sen. Bill No. 781 approved by Governor, Sept. 25, 1979, Sen. Final Hist. (1979-1980 Reg. Sess.) p. 471; Assem. Bill No. 2497 approved by Governor, Aug. 30, 1980, Assem. Final Hist. (1979-1980 Reg. Sess.) p. 1467; Assem. Bill No. 518 approved by Governor, Sept. 11, 1981, Assem. Final Hist. (1981-1982 Reg. Sess.) p. 409; Assem. Bill No. 499 approved by Governor, July 1, 1981, Assem. Final Hist. (1981-1982 Reg. Sess.) p. 397; Assem. Bill No. 3258 approved by Governor, Aug. 22, 1986, Assem. Final Hist. (1985-1986 Reg. Sess.) p. 2085.) The Legislature revised the reporting standard to require reporting by designated professions whenever there exists a "reasonable suspicion" of child abuse. (§ 11166, subd. (a).) The purpose of this change was to remove impediments to reporting engendered by the "personal observation" requirement of *Landeros* v. *Flood, supra,* 17 Cal.3d at page 415. (State Bar of Cal., Rep. on Assem. Bill No. 2497, *supra*, pp. 1-2; Legis. Counsel's Dig., Sen. Bill No. 718, 3 Stats. 1980 (Reg. Sess.) Summary Dig., p. 333.)

Simultaneously, the Legislature deleted the exception to the civil and criminal immunity afforded mandatory reporters for false reports which the reporting party "knew or should have known . . . [were] false." (Compare former § 11161.5 and § 11172, subd. (a).) By contrast, liability for known false reports was retained for persons voluntarily reporting suspected instances of child abuse. (See Sen. Bill No. 781 approved by Governor, Sept. 25, 1979, Sen. Final Hist. (1979-1980 Reg. Sess.) p. 471; Stats. 1980, ch. 1071, p. 3424.) A 1986 amendment to section 11172, subdivision (a), further expanded liability of voluntary reporters to include reports "made with

reckless disregard of the truth or falsity of the report. . . ." (Legis. Counsel's Dig., Assem. Bill No. 3258, Stats. 1986 (Reg. Sess.) 1 Summary Dig., p. 178.)

We concur with the conclusion in *Storch* that the deletion of the "knew or should have known" qualification for mandatory reporters evidences a legislative intention to grant absolute immunity to persons required to report suspected cases of child abuse, while affording more limited immunity to others. (*Storch* v. *Silverman, supra,* 186 Cal.App.3d at p. 679.) The 1984 amendment to section 11172 expanding liability of *voluntary reporters* only bolsters this conclusion. ██ ██ A contrary construction of section 11172, holding mandatory reporters liable for false or reckless reports, would violate a settled rule of statutory construction which requires that "qualifying words, phrases or clauses [be] construed as referring to the words, phrases and clauses immediately preceding and not to more remote words, phrases, or clauses." (*Addison* v. *Department of Motor Vehicles* (1977) 69 Cal.App.3d 486, 496 [138 Cal.Rptr. 185].) Had the Legislature intended to retain limitations on immunity for false and reckless reports in the case of mandatory reporters, it would have done so expressly, as it did in the case of voluntary reporters. (Cf. *Addison* v. *Department of Motor Vehicles, supra,* at p. 496.)

### *Section 11172 as Amended in 1984*

In 1984, section 11172 was amended. (Assem. Bill No. 2702 approved by Governor, Sept. 15, 1984, Assem. Final Hist. (1983-1984 Reg. Sess.) p. 1675.) Subdivision (c) was added, providing reimbursement by the state for legal expenses incurred by mandatory reporters who successfully defended against claims resulting from reports of child abuse. As amended, section 11172 provides, inter alia: "(c) The Legislature finds that even though it has provided immunity from liability to persons required to report child abuse, that immunity does not eliminate the possibility that actions may be brought against those persons based upon required reports of child abuse. In order to further limit the financial hardship that those persons may incur as a result of fulfilling their legal responsibilities, it is necessary that they not be unfairly burdened by legal fees incurred in defending those actions. Therefore, a child care custodian, medical practitioner, nonmedical practitioner, an employee of a child protective agency, or commercial film and photographic print processor may present a claim to the State Board of Control for reasonable attorneys' fees incurred in any action against that person on the basis of making a report required or authorized by this article if the court has dismissed the action upon a demurrer or motion for summary judgment made by that person, or if he or she prevails in the action. . . ."

Appellant argues, in essence, that the subsequent legislative provision of legal expenses for a mandatory reporter who "prevails" in a legal action supplies proof that in some lawsuits involving reports of suspected child abuse, the mandatory reporter may not prevail. She suggests, in other words, that if the Legislature had intended to grant absolute immunity to mandatory reporters, it would not have been necessary to limit reimbursement of legal expenses to *prevailing* parties since mandatory reporters would *always* prevail in lawsuits for damages resulting from reports of suspected child abuse.

In support of this contention, appellant has furnished various legislative documents which discuss the 1984 amendments to section 11172. We have examined these documents and find little, if any, support for appellant's interpretation of the statute.

In a report by Assemblyman Gray Davis, the sponsor of Assembly Bill No. 2702 (AB No. 2702), he describes the reasons underlying the proposed amendments to section 11172.

"AB 2702 is designed to increase reporting of suspected child abuse by professionals already legally mandated to report. According to the many child abuse experts I have consulted, fear of being sued and incurring great legal fees is the most common fear among mandatory reporters. Existing law grants these professionals immunity from criminal and civil liability as a result of reporting abuse as required. However, professionals are frequently threatened with being sued, and a few civil suits have been filed against reporters. Therefore, my legislation will allow a mandatory report [*sic*] who prevails in such an action to file a claim with the State Board of Control for reimbursement of reasonable legal costs. . . . I believe that if the state mandates that professionals report child abuse, then the state should also provide them full legal and financial protection for complying with this crucial obligation." (See Rep. of Assemblyman Gray Davis on AB 2702 (1983-1984 Reg. Sess.) June 6, 1984, p. 2.)

Appellant refers to the Davis report without explaining how it supports her contention that *Storch* was wrongly decided. The report discloses that Assemblyman Davis sponsored AB 2702 to promote increased reporting of child abuse by designated professionals by affording "full legal and financial protection" for complying with the obligation to report. An interpretation of section 11172 which confers absolute immunity upon mandatory reporters is entirely consistent with such a goal.

Appellant also places emphasis upon portions of a memorandum to Marrion Wong of the Department of Finance, from Joyce Wallach of the Office

of Assemblyman Davis. That memorandum states, inter alia: "AB 2702 initially provided that a plaintiff would be liable for the mandatory reporter's legal costs when that professional prevailed in the action. Some committee members raised the concern that this might have a chilling effect on a plaintiff with a legitimate triable issue of fact. The concern was also raised that in the case of a plaintiff with limited means, a mandatory reporter might have difficulty recovering the legal damages. Our amendment eliminated these concerns."[4]

Appellant argues that the reference in the Wallach memorandum to a plaintiff "with a legitimate triable issue of fact" furnishes proof that section 11172 did not grant absolute immunity to mandatory reporters because "*legitimate triable issue[s] of fact*" would not exist if absolute liability were granted.[5] (Italics added.) A related argument is made with respect to those portions of subdivision (c) of section 11172 which provide for the payment of legal expenses "not [to] exceed an aggregate amount of fifty thousand dollars ($50,000)" only "if the court has dismissed the action upon a demurrer or motion for summary judgment made by [the mandatory reporter], or if he or she prevails in the action." It is asserted that immunity *must* be limited because the statutory reference to summary judgment, and provision for legal expenses in such a large amount, implies a legislative awareness that, in some cases, questions of fact may require litigation.

These arguments are not persuasive. Apart from the question of immunity, a legitimate triable issue of fact might well exist regarding a child abuse reporter's identity as a "child care custodian, medical practitioner, nonmedical practitioner, employee of a child protective agency, or commercial film and photographic film processor" or mere voluntary reporter. (§ 11172, subd. (a).) A complaint arising from a report of suspected child abuse might survive a demurrer if it were alleged that the defendant was *not* subject to the mandatory reporting requirements of section 11166. Yet a subsequent factual determination that the defendant was a mandatory reporter would compel a judgment in favor of the defendant at a later stage of the proceedings. Depending upon the number of plaintiffs and defendants, the extent of

---

[4] As originally proposed, AB 2702 provided for payment of legal expenses by the plaintiff rather than the state. (See AB 2702 (1983-1984 Reg. Sess.) as amended Mar. 22, 1984.)

[5] The Wallach memorandum contains the following paragraph which contradicts appellant's contention that the Legislature did not intend to grant absolute immunity to mandatory reporters: ". . . Because mandatory reporters are granted complete immunity from liability as a result of reporting as authorized or required, any civil suit should be dismissed upon demurrer or motion for summary judgment. Therefore, legal costs in such cases would be limited. However, the fear of being sued and incurring great legal costs is very prevalent among professionals who come into contact with abused children." Appellant's attempt to explain away Ms. Wallach's use of the term "complete immunity" is unconvincing.

pretrial discovery, and the complexity and duration of pretrial proceedings, the legal expenses incurred by a single mandatory reporter might be substantial.

It seems naive or disingenuous to suggest that a law granting absolute immunity to mandatory reporters would necessarily guarantee that all lawsuits resulting from required reports of suspected child abuse would be disposed of by demurrer. In reality, a complaint may be sufficiently vague, or artfully drafted so as to survive a demurrer based upon the immunity statute.[6] Moreover, because the filing of a lawsuit, coupled with service of process, will prompt most professionals to seek the advice and assistance of a lawyer, attorney's fees and costs in some amount will be incurred even if a hastily filed demurrer results in a judgment in favor of the defendant. Memorandum references to "triable issues of fact," and statutory references to legal proceedings requiring the resolution of contested factual issues, therefore, reflect nothing more than a legislative acknowledgment that substantial legal expenditures might be required of mandatory reporters as a consequence of reports of suspected child abuse *despite* the granting of absolute immunity.

As further evidence of legislative intent, appellant submits a letter from Attorney General John Van de Kamp to Assemblyman Davis, regarding AB 2702, which contains the following paragraph: "This bill requires the court to award attorney's fees and costs to those sued for reporting child abuse if the party reporting prevails in the litigation. Existing law purports to provide immunity from such suits (Penal Code section 11172); however, courts have held that issues such as good faith require an evidentiary defense with its attendant costs. Assembly Bill 2702 remedies this problem." (Letter from John Van de Kamp, Atty. Gen. for the State of Cal., regarding AB 2702 (1983-1984 Reg. Sess.) Apr. 2, 1984, p. 1.) Appellant argues that the Attorney General's letter constitutes further proof that the immunity granted mandatory reporters by section 11172 is not absolute.

Viewed in historical context, the Attorney General's letter furnishes little support for the construction of the immunity statute proposed by appellant. The letter was written more than two years before *Storch* v. *Silverman* interpreted section 11172 as granting mandatory reporters absolute immunity from liability resulting from required reports of suspected child abuse. The fact that in 1984, some courts were requiring evidentiary hearings on the issue of "good faith" suggests nothing more than that the statute was unclear until judicially construed.

---

[6] At the hearing of respondent's demurrer, the trial court expressed concern that appellant was "just engaging in a[n] act of artful pleading to avoid the clear immunity statute. . . ."

The 1984 amendments to section 11172 do not support the contention that limited immunity for mandatory reporters was intended.

*Immunity for Professional Services Rendered to Identify Child Abuse*

■ Appellant's final contention is that it was an abuse of discretion to sustain respondent's demurrer without leave to amend because the complaint states causes of action, or could be amended to state causes of action for professional negligence and intentional infliction of emotional distress. Apart from whether sufficient facts are alleged to establish these causes of action, a threshold question must be answered. Are mandatory reporters completely immune from liability for professional services rendered in connection with the identification or diagnosis of suspected cases of child abuse, or just for the act of reporting? Appellant's argument implicitly assumes that the immunity conferred by section 11172 is limited to liability for damages caused by *the act of reporting*.

In the absence of controlling authority, we again consider *Storch*, which addressed a related question. ". . . [I]s there immunity for those mandated reporters *who are involved in the identification of an instance of child abuse* but do not personally report it to the authorities?" (*Storch* v. *Silverman, supra,* 186 Cal.App.3d at p. 681, italics added.) That question was answered, yes. (*Ibid.*) In *Storch*, the appellate court recognized that "[i]n many instances the discovery of child abuse will be a collaborative event." (*Storch* v. *Silverman, supra,* at p. 681.) For that reason, when two or more mandatory reporters jointly discover or suspect child abuse, section 11166, subdivision (e) permits the making of a single report by "a member of the team selected by mutual agreement. . . ." The *Storch* decision concludes: "Team immunity is consistent with the purpose and intent of the Legislature in promoting the reporting of child abuse. Limitation of immunity to the person making the telephone call to the agency or signing the report would defeat that purpose." (*Storch* v. *Silverman, supra,* 186 Cal.App.3d at p. 681.)

Similarly, limiting immunity to the protection of professionals against lawsuits resulting from the *act of reporting* would defeat the Legislature's goal of promoting increased reporting of child abuse. The Legislature has identified the fear of civil liability for allegedly false reports as a major deterrent to the reporting of suspected cases of child abuse by professionals. Recent revisions to the Child Abuse Reporting Act have been largely directed at reducing or eliminating, to the extent possible, professional fear of litigation resulting from required reports. A law conferring "absolute" immunity for the act of reporting suspected child abuse, but *not* for professional activities contributing to its identification, would not likely allay the fear

of a prospective reporter that an angry parent might initiate litigation for damages, following a report which is subsequently proven to be mistaken.

Reporting is expressly required of a designated professional "who has knowledge of or observes a child *in his or her professional capacity or within the scope of his or her employment* whom he or she knows or reasonably suspects has been the victim of child abuse. . . ." (Pen. Code, § 11166, subd. (a), italics added.) The Legislature's use of the highlighted language clearly contemplates that, in most cases, mandatory child abuse reporting will be preceded by the rendering of professional services by the party making the report. It strains credulity to suggest that the Legislature intended that immunity be granted for the act of reporting but not for the rendering of professional services resulting in the identification of a suspected case of child abuse.

In enacting the Child Abuse Reporting Act, the Legislature considered the possibility that professional fear of civil liability for the *failure* to report might result in misleading or incorrect reports, but determined that the protection given to children would outweigh any inconvenience or harm to innocent parties caused by a child abuse investigation. (See Rep. of the Sen. Com. on Judiciary on Sen. Bill No. 781 (1979-1980 Reg. Sess.) p. 5.) Insofar as liability for damages to a person falsely accused of child abuse is concerned, we conclude that section 11172 was intended to provide absolute immunity to professionals for conduct giving rise to the obligation to report, such as the collection of data, or the observation, examination, or treatment of the suspected victim or perpetrator of child abuse, performed in a professional capacity or within the scope of employment, as well as for the act of reporting.

The judgment is affirmed.

Compton, Acting P. J., and Gates, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 24, 1988.