[No. D010223. Fourth Dist., Div. One. Oct. 16, 1990.]

LINDA THOMAS et al., Plaintiffs and Appellants, v.
DAVID L. CHADWICK et al., Defendants and Respondents.

COUNSEL

Thompson & Lee, David R. Thompson and Deborah Peterson-Lee for Plaintiffs and Appellants.

McInnis, Fitzgerald, Rees, Sharkey & McIntyre, Cary W. Miller, Horvitz & Levy, Barry R. Levy and Douglas G. Benedon for Defendants and Respondents.

OPINION

**FROEHLICH, J.**—Appellants Linda Thomas and Harvey Thomas, individually and as guardian ad litem for Latoya Thomas, appeal from the judgment entered in favor of respondents David L. Chadwick and Children's Hospital and Health Center following an order granting respondents'

motion for judgment on the pleadings. Appellants' complaint sought damages from respondents under 42 United States Code section 1983, claiming acts of respondents ultimately led to appellants being deprived of their civil and constitutional rights.

1. *Factual Background*

The facts presented[1] are undeniably tragic. On January 17, 1986, appellants' two-month-old child, Harvey, was transferred from a hospital in Brawley, California to Children's Hospital and Health Center in San Diego, California. The infant was examined by Dr. Chadwick, a physician employed by Children's Hospital, who failed to recognize the infant was suffering symptoms attributable to a congenital defect (i.e., a subdural hematoma caused by an arteriovenous malformation of the brain). Instead, Dr. Chadwick diagnosed the child was suffering from injuries of a nonaccidental nature which could only have resulted from a violent shaking or a fall. Because of the suspicion of child abuse, respondents filed a report pursuant to the state Child Abuse and Neglect Reporting Act. (Pen. Code,[2] § 11164 et seq.) Appellants alleged this report (the initial report) was filed without knowledge or reasonable suspicion abuse had occurred, and further alleged respondents had recklessly misdiagnosed the infant's true condition.[3]

The infant died from his condition four days later, and his remains were transferred to the San Diego County Coroner for an autopsy. The autopsy originally described the cause of death as hypoxic encephalopathy due to a subdural hematoma caused by a blunt injury to the side of the head. Appellants claim the autopsy was negligently performed and was subsequently relied upon to support criminal and judicial proceedings against appellants.

On February 18, 1986, respondents sent a letter (the subsequent report) to the Imperial County District Attorney's Office, informing the district

[1] The standard for reviewing an order granting judgment on the pleadings is the same for an order sustaining a general demurrer. We examine only the face of the pleading, accepting as true all material facts properly pled, regardless of the difficulty of proving such facts, to determine whether such facts give rise to a cause of action. (*Hughes* v. *Western MacArthur Co.* (1987) 192 Cal.App.3d 951, 954-955 [237 Cal.Rptr. 738]; *Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216].)

[2] All statutory references are to the Penal Code unless otherwise specified.

[3] On appeal, appellants urge that Chadwick "intentionally misdiagnosed" the infant's condition and "maliciously, intentionally and fraudulently fabricated false charges of child abuse against [the appellants]," apparently contending Chadwick in fact knew his reports of child abuse were false. Although the second amended complaint does not plead such facts, but alleges the reports were made negligently or recklessly, we assume for purposes of this appeal that if given the opportunity appellants would have amended their complaint to state Chadwick's misdiagnosis was intentional. (*MacIsaac* v. *Pozzo* (1945) 26 Cal.2d 809, 815-816 [161 P.2d 449].)

attorney of the child's death, restating Chadwick's erroneous diagnosis, and urging the district attorney to take action to remove appellants' other child, Latoya, from her parents' home. Respondents allegedly sent this letter with full knowledge of the consequences it would cause.

As a result of the initial report, the subsequent report and the autopsy, the district attorney recommended to the probation department that dependency proceedings under Welfare and Institutions Code section 300 et seq. be commenced with respect to Latoya. Based on the district attorney's recommendation, the Brawley police department removed Latoya from her parents' custody on February 21, 1986, and dependency proceedings were commenced. The hearing on the Welfare and Institutions Code section 300, subdivision (a) petition was timely held.

■■■■ Appellants contested the legal proceedings,[4] obtained an attorney and also hired their own medical expert to review the autopsy and the infant's remains to determine the true cause of death. Appellants' expert apparently convinced the county coroner the true cause of death was a

---

[4] Based on the facts alleged in the complaint, we question appellants' ability to state a cause of action under 42 United States Code section 1983, because there does not appear to have been any deprivation of a constitutionally protected interest *without due process of law*. Latoya was removed on a Friday, and the dependency petition was heard on the next judicial day, all in accordance with Welfare and Institutions Code sections 305, 313 and 315. Appellants were deprived of an interest protected by the Fourteenth Amendment's due process guaranties (i.e., familial autonomy free from unwarranted governmental intrusion; see generally, *Lassiter* v. *Department of Social Services* (1981) 452 U.S. 18 [68 L.Ed.2d 640, 101 S.Ct. 2153]). However, the deprivation does not appear to have been accomplished "without due process," which is essential to appellants' section 1983 claim. (See, e.g., *Baker* v. *McCollan* (1979) 443 U.S. 137, 145 [61 L.Ed.2d 433, 442, 99 S.Ct. 2689] [Fourteenth Amendment does not protect against all deprivations, but only against deprivations without due process].)

Where due process is accorded to the injured party, he has no claim under section 1983 even though he was deprived of a liberty interest based on false accusations. "The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted—indeed, for every suspect released." (443 U.S. at p. 145 [61 L.Ed.2d at p. 442]; see also *Cook* v. *Houston Post* (5th Cir. 1980) 616 F.2d 791, 793-795 [false accusations leading to indictment and trial do not give rise to § 1983 claim where due process accorded, and right to be free from slanderous impact of false accusations (while protected by state law) is not a constitutional interest compensable under § 1983].) Here appellants were accorded a prompt postdeprivation hearing regarding Latoya's removal. Numerous courts have concluded that because the state has a compelling interest in taking immediate action to protect the child's safety, temporary removal followed by prompt postdeprivation court proceedings satisfies procedural due process guaranties. (See *Lossman* v. *Pekarske* (7th Cir. 1983) 707 F.2d 288, 291; *Fitzgerald* v. *Williamson* (8th Cir. 1986) 787 F.2d 403, 408; *In re Scott County Master Docket* (D.Minn. 1987) 672 F.Supp. 1152, 1169-1171.)

From all appearances, the statutory procedures followed here are reasonable, and there is no indication appellants were otherwise deprived of due process. However, in light of our conclusion that the immunity statute insulates respondents from section 1983 liability, we need not address the issue of constitutionality of the California statutory scheme (i.e., of temporary removal followed by postdeprivation hearings).

congenital defect, causing the coroner to amend his autopsy report to state the true cause of death. As the result of the amended autopsy report, appellants were cleared of all charges.

### 2. *Procedural History*

Appellants, after being relieved of the claims-filing requirement under Government Code section 910, sued respondents on a host of theories. In appellants' first amended complaint, they alleged causes of action against respondents for medical negligence, negligent and intentional infliction of emotional distress, and civil rights violations under 42 United States Code sections 1983, 1985 and 1986. Respondents' demurrer was sustained with leave to amend based on respondents' contention the immunity provisions of section 11172, subdivision (a) barred any claims against respondents for damages.

Appellants' second amended complaint was limited to damages for alleged civil rights violations under 42 United States Code section 1983. Appellants claimed respondents acted negligently and recklessly in making the initial report and the subsequent report of suspected child abuse. They further claimed such reports "caused"[5] the Imperial County District Attorney to initiate dependency proceedings, depriving appellants of their constitutional right to family unity undisturbed by unwarranted government interference.

Respondents subsequently moved for judgment on the pleadings, arguing (among other things) there was no "state action" or "acts under color of state law" by respondents, or alternatively, that respondents' acts were protected by absolute immunity under state and federal law. The trial court granted respondents' motion.[6]

---

[5] Appellants' section 1983 claim against respondents also appears to founder on the shoals of the "causation" requirement. Liability under section 1983 requires that the defendant's actions be the proximate cause (not merely the cause-in-fact) of the deprivation. (*Arnold* v. *Intern. Business Machines* (9th Cir. 1981) 637 F.2d 1350, 1355.) Several courts have concluded that merely supplying authorities with a report of criminal activity does not "proximately cause" the resulting arrest, reasoning that the intervening governmental investigation or decision to prosecute is a superseding cause. (See, e.g., *Arnold* v. *Intern. Business Machines*, *supra*, 637 F.2d at pp. 1356-1358; *McKenzie* v. *Lamb* (9th Cir. 1984) 738 F.2d 1005, 1011.) Appellants cite no authority to the contrary. However, in light of the dispositive effect of the statutory immunity, it is unnecessary to reach this issue.

[6] The precise grounds relied upon by the trial court are unclear. Although the trial court did conclude there was no state action, the court also questioned (1) whether there was any showing of "causation" (since respondents merely submitted the reports but the actual "injury" was caused by the judicial proceedings, commenced on the basis of judgments exercised by state agents); (2) whether there was any showing of a constitutional deprivation (because Latoya's removal was accompanied by sufficient "due process"); and (3) whether the absolute immunities operated to bar all damage claims, including section 1983 claims.

### 3. *Contentions on Appeal*

Appellants' appeal raises several contentions. First, appellants urge the immunity provisions of section 11172, subdivision (a) only apply to reports based on a "reasonable suspicion" of child abuse, and do not protect reports made negligently or recklessly. Second, they argue the immunity protects only the initial report, and does not extend to the subsequent report made by respondents to the Imperial County District Attorney. Finally, they argue that even if the state law immunities bar their state law claims, they have adequately stated a claim for damages for civil rights violations which may not be barred by state law immunities. We address their claims seriatim.

### 4. *The Immunities Provided by Section 11172, subdivision (a) to Mandated Reporters Protects Negligent, Reckless or Even Intentionally False Reports*

■ Appellants first argue section 11172, subdivision (a)[7] only extends immunity to reporters when the suspicion of abuse is "reasonable," because said section only immunizes reports "required or authorized" by section 11166, and section 11166 only requires reports when there is a "reasonable suspicion" of abuse. When the suspicion is not *reasonable*, appellants argue, reports are not shielded by the privilege.

The precise contention advanced by appellants has already been evaluated and soundly rejected in two recent well-reasoned cases. In *Storch* v. *Silverman* (1986) 186 Cal.App.3d 671 [231 Cal.Rptr. 27], the court analyzed the statutory scheme of the Child Abuse Reporting Law (§ 11164 et seq., the state act) in order to evaluate plaintiff's claim that the immunity provisions did not immunize reports based on negligent or reckless misdiagnosis. The court, per Justice Arabian, reviewed the language and purposes of the state act, along with the legislative history and genesis of the reporting laws, and reached the conclusion that the immunity provided to *mandated* reporters[8] was *absolute*. (*Storch* v. *Silverman, supra*, 186 Cal.App.3d

---

[7] Section 11172, subdivision (a) provides in pertinent part: "No child care custodian, health practitioner, employee of a child protective agency, or commercial film and photographic print processor who reports a known or suspected instance of child abuse shall be civilly or criminally liable for any report required or authorized by this article. Any other person reporting a known or suspected instance of child abuse shall not incur civil or criminal liability as a result of any report authorized by this article unless it can be proven that a false report was made and the person knew that the report was false or was made with reckless disregard of the truth or falsity of the report . . . ."

[8] Certain statutorily enumerated classes of individuals are "mandated reporters," in that they are *required* to report known or reasonably suspected cases of child abuse within a specified time frame (§ 11166, subd. (a)), the failure of which exposes them to potential

at pp. 676-681.) In *Krikorian* v. *Barry* (1987) 196 Cal.App.3d 1211 [242 Cal.Rptr. 312], the court was asked to repudiate *Storch*'s holding that the state act conferred absolute immunity to mandated reporters for false reports made with malice. After extensive review of the statutory scheme and legislative history (focusing particularly on the genesis of the statutory grant of immunity to reporters), the *Krikorian* court concluded the immunity for mandated reporters was intended to be absolute, even for false or reckless reports. (*Id.* at pp. 1215-1222.)

We subscribe to the reasoning of *Storch* and *Krikorian*. The plain language of the statute grants absolute immunity to mandated reporters. While the Legislature placed some limits on the immunity enjoyed by *voluntary* reporters (i.e., forfeiture of immunity for knowingly false reports or reports made with reckless disregard for the truth or falsity of the report), *it omitted placing any similar limitations on the immunity enjoyed by mandated reporters*. Such omission indicates the Legislature intended that *even intentionally false* reports by a mandated reporter are immunized. ■ (See *Balboa Ins. Co.* v. *Aguirre* (1983) 149 Cal.App.3d 1002, 1008 [197 Cal.Rptr. 250] ["As a general rule of statutory construction '[w]here a statute on a particular subject omits a particular provision, the inclusion of such a provision in another statute concerning a related matter indicates an intent that the provision is not applicable to the statute from which it was omitted.' [Citations]"].)

■ "Had the Legislature intended to [limit] immunity for false and reckless reports in the case of mandatory reporters, it would have done so expressly, as it did in the case of voluntary reporters. [Citation.]" (*Krikorian* v. *Barry, supra,* 196 Cal.App.3d at p. 1218.) In light of the statutory language, the legislative purposes and the historical genesis of the statutory immunities, we agree that the Legislature intended to grant absolute immunity to mandated reporters for all required or authorized reports, even though based on a negligent, reckless or false diagnosis.

5. *The Absolute Immunity Extends to Both the Initial and Subsequent Reports by Respondents*

■ Appellants next argue the Legislature only intended the absolute immunity to protect the initial report,[9] and did not intend to protect any

---

criminal penalties (§ 11172, subd. (e)). All other nonenumerated classes of people are "permissive reporters" who may, but are not required to, report suspected abuse. (§ 11166, subd. (d).)

[9] Section 11166, subd. (a) provides, in pertinent part, that a mandated reporter who reasonably suspects child abuse " . . . shall report the known or suspected instance of child abuse to a child protective agency immediately or as soon as practically possible by telephone and

reports beyond the required initial report. Thus, appellants argue respondents' subsequent report to the Imperial County District Attorney is outside the ambit of the privilege.

Our review of the statutory scheme convinces us the Legislature intended section 11172, subdivision (a) to immunize mandated reporters from civil or criminal liability for both the required initial report and subsequent reports. The fundamental goal of statutory interpretation is to ascertain the Legislature's intent to effectuate the purpose of the law, focusing not only on the words used but also the objectives of the statute, the evils to be remedied and the legislative history of the statute. (*People* v. *Aston* (1985) 39 Cal.3d 481, 489 [216 Cal.Rptr. 771, 703 P.2d 111].)

We are not left to guess at the legislative purposes of the state act, since there is a wealth of material providing guidance as to the Legislature's intent. (See generally, *Storch* v. *Silverman, supra,* 186 Cal.App.3d at pp. 679-681; *Krikorian* v. *Barry, supra,* 196 Cal.App.3d at pp. 1215-1222.) The fundamental purpose of the statutory scheme is to protect children from abuse. (§ 11164, subdivision (b).) To facilitate that purpose, the state act implements numerous duties, immunities and procedures to ensure suspected child abuse is reported and investigated as expeditiously as possible. (*Storch* v. *Silverman, supra,* 186 Cal.App.3d at p. 678 [the state act is designed "to encourage the reporting of child abuse to the greatest extent possible to prevent further abuse"]; *Krikorian* v. *Barry, supra,* 196 Cal.App.3d at p. 1217 [the state act "comprised the Legislature's attempt to rectify the problem of inadequate child abuse reporting"].) To encourage reporting, the Legislature granted reporters broad immunities to obviate the chilling effect the spectre of civil lawsuits would have upon a reporter's willingness to become involved. (*Id.* at p. 1222.)

Contrary to appellants' contention, the absolute immunity is not limited to the "required" initial report. Instead, it explicitly protects reports "required *or authorized*" by the state act. (§ 11172, subdivision (a), italics added.) The state act contemplates that mandated reporters may be involved in communications beyond the initial "required" report. In *Ferraro* v. *Chadwick* (1990) 221 Cal.App.3d 86 [270 Cal.Rptr. 379], this court held that the absolute immunity extends to both "required reports" *and* "authorized reports." The *Ferraro* court reasoned that the legislative scheme[10] contemplated communications *after* the required initial report be-

---

shall prepare and send a written report thereof within 36 hours of receiving information concerning the incident . . . ."

[10] The statutory scheme obviously contemplates "authorized" reports and communications will occur beyond the time frame for the "required" initial report. Thus, for example, while the reporter's identity and the contents of the report are confidential (§§ 11167, subdivision

tween the reporting medical practitioner and investigating agencies (including the district attorney), and that the "or authorized" language was not merely surplusage (as appellants apparently argue) but was intended to extend the protective umbrella of the absolute privilege to *subsequent* reports and communications. We fully subscribe to the reasoning in *Ferraro*. It would be anomalous to conclude that the reporter's "required" report of suspected child abuse is privileged, but that the legislatively contemplated subsequent communications concerning the incident would expose the reporter to potential civil liability. Such an interpretation would render nugatory the statutory language extending the privilege to "authorized reports," and would frustrate the legislative purpose by resurrecting the precise damper on full reporting and cooperation which the legislative scheme was designed to eliminate. (Accord *McMartin* v. *Children's Institute International* (1989) 212 Cal.App.3d 1393, 1398-1401 [261 Cal.Rptr. 437] [investigative and reporting activities after original reports of abuse surfaced were privileged under section 11172].)

Appellants have cited no authority to undercut the analysis of *Ferraro*.[11] Accordingly, we conclude the immunity protects both initial and subsequent reporting activities required or authorized by law.

---

(d) and 11167.5, subdivision (a)), the reporter's identity (along with the report itself) may be disclosed to investigators and the district attorney. (§§ 11167, subdivision (d), 11167.5, subdivision (b).) These provisions must contemplate that investigators will contact the reporter (especially when the reporter is a medical practitioner) as part of their investigation after the required initial report, and that the reporter would provide information to these investigators long after the time frame for the "required" report had elapsed.

Moreover, to foster cooperation and full exchanges of information between reporting medical practitioners and governmental agencies charged with protecting children, the statutory scheme also mandates that child protective agencies disclose to reporting medical practitioners information concerning other suspected incidents of child abuse relevant to the current incident. (§ 11170.) This provision must contemplate the medical practitioner will make some use of the information received after he has already made the initial report, and it would be senseless to assume the Legislature intended that the medical practitioner *use* the information, but because of fear of civil liability be unable to *convey* his findings to authorities as a subsequent "authorized" report shielded by immunity.

[11]Appellants rely on several cases for the contention that only the initial report is privileged. These authorities are inapposite. For example, in *People* v. *Stritzinger* (1983) 34 Cal.3d 505 [194 Cal.Rptr. 431, 668 P.2d 738], the issue was whether a psychotherapist could be *compelled*, despite the psychotherapist-patient privilege, to make reports of abuse beyond the required initial report. The narrow holding of *Stritzinger* was that the psychotherapist's obligation to report was discharged by the initial report, and he had no statutory *obligation* to make later reports; it did not hold subsequent reports were *unprotected* by the absolute immunity. (*Id.* at pp. 512-514.) The same issue was present in *People* v. *John B.* (1987) 192 Cal.App.3d 1073 [237 Cal.Rptr. 659], where the court concluded there was no continuing duty to make subsequent reports, but did not address whether immunity would protect voluntarily made subsequent reports. In *People* v. *Younghanz* (1984) 156 Cal.App.3d 811 [202 Cal.Rptr. 907], immunity was not at issue. Instead, the issue was whether the reporting requirements transformed psychotherapists into state agents for purposes of the right against self-incrimination. The court held section 11166 mandated the initial report only, and did not

### 6. California's Immunity Statute Bars a Claim Under 42 U.S.C. Section 1983 Because the Immunity Statute Is Congressionally Authorized

█ The more perplexing issue is whether the California immunity statute validly immunizes respondents against appellants' claim under 42 United States Code section 1983.[12] █ Ordinarily, state statutory immunities cannot protect a defendant against federal civil rights litigation because of the supremacy clause of the United States Constitution. (*Guillory v. County of Orange* (9th Cir. 1984) 731 F.2d 1379, 1382.) The preemptive effect of the supremacy clause precludes enforcement of an inconsistent state law defense to section 1983 liability where Congress has shown no intent to adopt or engraft state law defenses onto federally secured rights.

---

transform the psychotherapist into a state agent because no investigative obligations were owed by the psychotherapist.

[12] The trial court accepted respondents' contention that the appellants' section 1983 claim failed because respondents were private actors who were not acting "under color of state law," an essential element of a section 1983 claim. (*Flagg Bros., Inc.* v. *Brooks* (1978) 436 U.S. 149, 155 [56 L.Ed.2d 185, 193, 98 S.Ct. 1729].) As indicated *ante*, we have substantial doubt appellants could state a section 1983 claim even in the absence of the immunity statute because of the "due process" and "causation" problems (noted in fns. 3 and 4, *ante*). The "color of state law" element probably presents a similar impediment. Persuasive authority exists for the proposition that a private person's action is not "state action" even though taken in response to a state statute compelling action, when the substance of the action is dependent upon a discretionary decision of the private person. (See generally, *Blum* v. *Yaretsky* (1982) 457 U.S. 991 [73 L.Ed.2d 534, 102 S.Ct. 2777] [decisions of private nursing homes to transfer or discharge Medicaid patients not state action requiring procedural due process]; *Polk County* v. *Dodson* (1981) 454 U.S. 312 [70 L.Ed.2d 509, 102 S.Ct. 445] [decisions by public defender not attributable to state policy or decision].) Additionally, the cases of *Schatte* v. *International Alliance, etc.* (9th Cir. 1950) 182 F.2d 158; *Thomas* v. *Beth Israel Hosp. Inc.* (S.D.N.Y. 1989) 710 F.Supp. 935; and *Haag* v. *Cuyahoga County* (N.D. Ohio 1985) 619 F.Supp. 262, cited by respondents, are also directly in point, although they do not touch on the *Adickes/Lugar* theory, discussed *post*, propounded by appellant.

What we denominate as the "*Adickes/Lugar*" concept is that a private party's actions can be "fairly attributable" to the state when they are compelled by state law. Since the statutory scheme both imposes criminal liability for failure to submit reports of known or reasonably suspected abuse, and encourages this compulsory reporting by condoning (through immunity) certain negligent or false reports, it can be argued that the making of the report takes on the color of state action. (See *Lugar* v. *Edmondson Oil Co.* (1982) 457 U.S. 922 [73 L.Ed.2d 482, 102 S.Ct. 2744]; *Adickes* v. *Kress & Co.* (1970) 398 U.S. 144, 169-171 [26 L.Ed.2d 142, 160-162, 90 S.Ct. 1598].) The rejoinder to this argument is that the state statute only compels the making of a report; it does not require the making of a false report, and in any event the contents of the report are determined by the private party rather than the state. (See generally, *Hooks* v. *Hooks* (6th Cir. 1985) 771 F.2d 935, 943 [private misuse or abuse of valid state statute is not state action]; *Earnest* v. *Lowentritt* (5th Cir. 1982) 690 F.2d 1198, 1201 [same].)

We do no more, however, than comment on these "state action" arguments. Our conclusion that the complaint must be dismissed is based upon our construction of the effectiveness of the immunity statute. Since we are required to affirm the trial court's ruling as correct based on the immunity provisions (see *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 18-19 [112 Cal.Rptr. 786, 520 P.2d 10]), the ruling's accuracy with respect to other possible grounds becomes somewhat irrelevant.

(*Williams* v. *Horvath* (1976) 16 Cal.3d 834, 838-842 [129 Cal.Rptr. 453, 548 P.2d 1125].)

However, the touchstone of preemption is congressional intent: Does the state law stand as an obstacle to achieving the federal purposes? (*Shaw* v. *Delta Air Lines, Inc.* (1983) 463 U.S. 85, 96 [77 L.Ed.2d 490, 500, 103 S.Ct. 2890].) Thus, state law defenses may be asserted against a section 1983 claim, even though they end up defeating the federal claim, if such defenses are not inconsistent with the intent and purpose of the federal law. (*Robertson* v. *Wegmann* (1978) 436 U.S. 584, 592-593 [56 L.Ed.2d 554, 562-563, 98 S.Ct. 1991].) ▮▮▮ In the context of this case we must determine whether the California immunity statute, if applied as a defense to appellants' section 1983 claim, would "' . . . stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" (*Michigan Canners & Freezers* v. *Agricultural Bd.* (1984) 467 U.S. 461, 469 [81 L.Ed.2d 399, 406, 104 S.Ct. 2518].)

Respondents urge, and we agree, that the challenged immunity statute does not frustrate the purposes and objectives of Congress. To the contrary, Congress is empowered to restrict the scope of section 1983 damage actions by creating new immunities to such claims. (*Tower* v. *Glover* (1984) 467 U.S. 914, 922-923 [81 L.Ed.2d 758, 765-767, 104 S.Ct. 2820].) We conclude Congress impliedly authorized the creation of such an immunity by its enactment in 1974 of the Child Abuse Prevention and Treatment Act. (42 U.S.C. § 5101 et seq., the federal act.)[13]

It is undisputed that Congress called for states to create statutory immunities to bar damage claims against reporters of suspected child abuse. (See 42 U.S.C. § 5106a (b)(1)(B).) The issue is whether, as a matter of statutory construction, it is consistent with Congress's intent to construe the immunity provisions as protecting against *all* damage claims based on the report, regardless of the theory of recovery pled by the injured party. As with all statutory construction, we must seek to ascertain and effectuate the purposes of the legislature, interpreting each statutory provision in a manner consistent with its apparent purpose, in light of the objectives to be achieved

---

[13] Although the supremacy clause ordinarily invalidates state laws which purport to limit federally granted rights, where Congress has *specifically authorized* state legislation on a subject, state laws (which would otherwise be preempted) will survive because Congress's express enabling legislation validates such state laws. (*Silver* v. *Woolf* (2d Cir. 1982) 694 F.2d 8, 12-13; see also *Goodyear Atomic Corp.* v. *Miller* (1988) 486 U.S. 174 [100 L.Ed.2d 158, 108 S.Ct. 1704] [state law required increased award to worker for injury arising from violation of state safety law; while a nuclear facility would normally be shielded from such state regulation because it performs federal functions, challenged state law upheld because Congress authorized such state regulation]; see generally, Rotunda et al., *Treatise on Constitutional Law: Substance and Procedure* (1986) § 12.6, pp. 642-647.)

and the evils to be remedied. (*DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 17 [194 Cal.Rptr. 722]; *Wotton* v. *Bush* (1953) 41 Cal.2d 460, 467 [261 P.2d 256].)

Congress intended the federal act to facilitate state programs whose objective is to prevent, identify and treat victims of child abuse. (See, e.g., 42 U.S.C. § 5106a (a).) Toward that goal federal grants to states were authorized, conditioned on the requirement that states have laws providing for reporting incidents of child abuse. One of the problems perceived by Congress was inadequate reporting (see 1974 U.S. Code Cong. & Admin. News, at pp. 2763-2765), growing in part out of the reporter's reluctance to incur potential civil liability from lawsuits based on erroneous reports.[14] To cure this evil, Congress required states to grant reporters immunity from prosecutions arising out of such reports. (See 42 U.S.C. § 5106a (b)(1)(B).) Thus, Congress clearly intended to authorize immunity for reporters in order to encourage more extensive reporting.

Because fear of civil liability was the impediment to reporting Congress sought to remove, it would be incongruous to construe the federal act as permitting avoidance of immunity (thus resurrecting the impediment to reporting) merely because the injured party pleads federal rather than state causes of action premised on the same operative conduct. If immunity is not applied to section 1983 claims, we apprehend Congress's intent will be frustrated, because reporters will often be exposed to suits akin to appellants' lawsuit against respondents.[15] We cannot ascribe to Congress an in-

---

[14] Congressional concern that prevention of child abuse was hampered by inadequate reporting procedures, based partly on the unwillingness of persons to become involved due to fear of retaliatory lawsuits, was evidenced on several occasions. For example, during the House of Representatives debate over the bill ultimately enacted as Public Law No. 93-247 and codified in 42 United States Code section 5101 et seq., one representative explained the purpose of the immunity clause in the federal legislation: " . . . [A] question was raised on immunity and why we have to get into this area. What has been proven . . . is that unless immunity is offered to people who are reporting child abuse, we just do not get the cases reported. [¶] The people are afraid, and through this fear of civil suits many, many hundreds of children have been in one way or another sent to their death, and that is no exaggeration . . . ." (Remarks of Representative Peyser, 119 Cong. Rec. 39232 (1973); see also Remarks of Representative Biaggi, 119 Cong. Rec. 34953 (1973).) We may properly examine the debates surrounding a bill's enactment to determine the intent of the legislation. (*Busic* v. *United States* (1980) 446 U.S. 398, 405-406 [64 L.Ed.2d 381, 388-389, 100 S.Ct. 1747]; *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 590 [128 Cal.Rptr. 427, 546 P.2d 1371].) In light of the consistent expressions of legislative concern over inadequate reporting of child abuse (see also Salzman, *Protection for the Child or Parent? The Conflict Between the Federal Drug and Alcohol Abuse Confidentiality Requirements and the State Child Abuse and Neglect Reporting Laws* (1985) 1985 S. Ill. U.L.J. 181, 189-197), we conclude that immunity from civil liability for reporters was the congressional intention behind 42 United States Code section 5106a (b)(1).

[15] If immunity does not extend to section 1983 claims, such claims will undoubtedly proliferate. Reporting is designed to spur some form of governmental intervention to protect an

tention to obviate the precise goals of the federal act by exempting a section 1983 claim from the ambit of immunity. To the contrary, we believe the congressional intent behind the immunity provision requires that immunity protect against all damage claims arising from the act of reporting, including claims artfully pled under section 1983.

This interpretation of the statute effectuates its primary purpose—encouraging more extensive reporting—in light of the evils of inadequate reporting which Congress sought to rectify. This interpretation also accords with the canon of statutory construction that to the extent two statutes appear to conflict, a later enactment which more specifically treats the subject should be construed as superseding the more general provisions of the prior statute covering the same subject. (See, e.g., *Callahan* v. *United States* (1932) 285 U.S. 515, 517-518 [76 L.Ed. 914, 916, 52 S.Ct. 454]; *State of Missouri* v. *Ross* (1936) 299 U.S. 72, 76 [81 L.Ed. 46, 49, 57 S.Ct. 60].) While the federal act does not explicitly declare that reporters' immunities will bar section 1983 claims, section 1983 is a more generalized remedial statute, whereas 42 United States Code section 5106a (b)(1) narrowly and specifically addresses reporters' immunities. " 'It is a well settled principle of construction that specific terms covering the given subject matter will prevail over general language of the same *or another* statute which might otherwise prove controlling.' " (*Baltimore Nat. Bank* v. *State Tax Commission* (1936) 297 U.S. 209, 215 [80 L.Ed. 586, 591, 56 S.Ct. 417], italics added.)

Thus, while the more general remedy provided by section 1983 might have provided an avenue for damage claims against reporters, we interpret the more specific congressional enactment of 42 United States Code section 5106a (b)(1)(B) as engrafting an immunity defense for reporters upon section 1983 liability.

### 7.  *Conclusion*

The judgment is affirmed. By this affirmance we preclude appellants from any relief or compensation for the grievous injury which we must assume,

---

abused child. Indeed, Congress intended reports be acted upon by governmental authorities. (See, e.g., 42 U.S.C. § 5106a (b)(2)-(3).) Such action will frequently implicate the precise constitutional interest (i.e., the right to be free of unwarranted governmental interference with family life) upon which appellants' section 1983 claim is premised. The protective and encouragement functions served by the congressionally mandated immunity would be largely illusory if reporters were unprotected from a section 1983 lawsuit alleging governmental intervention caused by an erroneous report, i.e., the precise type of report which requires immunity (see *Storch* v. *Silverman, supra*, 186 Cal.App.3d at p. 678) and which the congressional enactment was designed to protect. (See Remarks of Representative Biaggi, 119 Cong. Rec. 34953 (1973) [". . . the State plans must include an effectively enforced child abuse reporting law . . . [including] immunity from prosecution for reporting—should there be any difficulties with a mistaken report. . ."].)

based upon our required acceptance of the truth of their pleadings, resulted from intentionally false and malicious acts on the part of the defendants. We do so because we are obligated to honor the determination of the Legislature that protection of one innocent segment of society warrants occasional injury to another. The mute and powerless victims of child abuse have long suffered at the hands of their tormenters. Society's protective voice, the Legislature has found, has been silenced by the fear of retaliation. The protection of the young victims, the Legislature has determined, requires that uncompensated injury occasionally result to an adult. In this war on child abuse the Legislature selected absolute immunity as part of its arsenal. This value choice is clearly within the province of the Legislature. We cannot defuse this chosen weapon on the ground that its effect is sometimes ill when its general purpose is good. The tragedy of war, whether it be against child abuse or between nations, is that the nature of its drastic measures is such as to inflict injury on some innocents while producing the general benefit of a desired end result.

Kremer, P. J., and Benke, J., concurred.

On November 14, 1990, the opinion was modified to read as printed above.