James and Sarah **HEDRICK**, individually and as Guardians Ad Litem for Jamie Hedrick, Plaintiffs,

v.

**QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC.,** f/k/a Smithkline Beecham Clinical Laboratories and Community Medical Care, LLC, f/n/a Community Medical Care, Inc. Defendants.

No. Civil Action 00C–10–187–JO.

Superior Court of Delaware, New Castle County.

Argued: Jan. 10, 2002.
Submitted: Jan. 18, 2002.
Decided: April 8, 2002.

Melanie K. Sharp, (argued) of Young, Conaway, Stargatt & Taylor, Wilmington, for plaintiffs.

Wayne A. Marvel, (argued) of Maron & Marvel, P.A., Wilmington, for defendant Quest Diagnostics Clinical Laboratories, Inc., f/n/a SmithKline Beecham Clinical Laboratories, Inc.

Gilbert F. Shelsby, Jr., of Morgan, Shelsby & Leoni, Newark, for defendant Community Medical Care, LLC, f/n/a Community Medical Care, Inc.

## OPINION

HERLIHY, J.

In circumstances novel to Delaware law, the motion before the Court puts in clear focus two significant but conflicting principles of public policy. One principle is the encouragement of the reporting of suspected child abuse and immunity from liability of those making such reports. The other is the right of redress, if any, of persons falsely accused of child abuse.

The motion for summary judgment of defendant Quest Diagnostic Clinical Laboratories, Inc., provides that focus. It is a medical testing facility. It received a urine sample marked with the name of plaintiff Jamie Hedrick. She was eight at the time. The testing revealed the presence of sperm. Quest notified Jamie's doctor who, in turn, notified the authorities.

That notice sparked an investigation. Plaintiff James Hedrick, at the time, was a New Castle County Police captain. His wife, plaintiff Sarah Hedrick, worked at the Philadelphia airport. Each was subjected to public humiliating experiences. Later, it was determined that the urine sample had been mislabeled and was not Jamie's. She also was subjected to some humiliating and embarrassing experiences.

Delaware statutory law provides qualified immunity from civil liability to anyone participating in good faith in making a report of abuse to the appropriate State agency or notifying the police of suspected child abuse. Since Quest did not make the report to anyone in authority, or the police, the issue presented is whether it is protected by this immunity provision by participating in the making of a report.

The Court holds that Quest participated in the making of the report and is immune from plaintiffs' civil action. Its motion for summary judgment is **GRANTED**.

### FACTUAL BACKGROUND

Quest, under various names, has been a medical testing laboratory for a number of years. It was formerly known as Smith-Kline Beecham Clinical Laboratories or Upjohn. While Quest is a Delaware corporation, the facility which tested the urine sample is located in West Norristown,

Pennsylvania. It is not licensed in any way in Delaware.

The sample, Quest testified, came to it in October 1998 from defendant Community Medical Care in Newark, Delaware. The sample had been collected from Jamie at the request of Dr. Paula Brenn, Jamie's doctor, who wanted testing in connection with a suspected urinary tract infection. It came to Quest with the name "Jamie Hedrick" written on it. Quest has a procedure for attaching its own label to the sample container and putting pertinent information into its computer system. Its label also had the name "Jamie Hedrick" on it.

The bulk of testing on these kind of samples occurs early in the morning. A laboratory technician initially tested the sample on October 22, 1998 and noted the presence of sperm. That technician left a note with the sample for Cynthia Mabry to see when she came in on her regular shift that morning. She recalls the note because the technician wrote sperm had been found in a child's urine. Quest's procedures for findings of such abnormalities is to retest the sample. Mabry took another sample from the urine and confirmed that there was sperm present.

Mabry then contacted her supervisor, Robert Gilmour. He had over thirty years experience in such testing. He said that he checked the slide Mabry had prepared when she took the rechecked sample. Mabry, however, recalls Gilmour preparing a new slide and again confirming the presence of sperm. This difference in recollection, however, has no significance to the current motion. Both then checked Quest's computer records. Eventually, they peeled off Quest's label with Jamie's name on it and saw her name on the label submitted by Community Medical Care.

After all of this was done, later on the 22nd, Gilmour called Dr. Brenn. She confirmed that Jamie was a female. He explained to Dr. Brenn Quest's procedures and findings.[1] She apparently notified someone in authority. Very shortly after Gilmour spoke to her, the police came to Quest and retrieved the urine sample. Subsequent DNA testing indicated the urine had come from a male.

For purposes of the current motion, the Court will recite from plaintiffs' complaint what happened to the Hedricks:

8. As a result of Defendants' false report, Sarah Hedrick was escorted by police officers from her place of employment at the Philadelphia Airport to her home to pick up Jamie.

9. As a result of Defendants' false report, Jamie and Sarah Hedrick and Jamie's younger sister, Marissa, were taken by police officers to AI DuPont Hospital for Children were both children were interviewed by John Humphrey of Children's Advocacy Center, a branch of DHSS.

10. Jamie was required to undergo a rape examination and to be interviewed a second time.

11. As a result of Defendants' false report, the Hedrick's home was searched and personal articles were seized.

\*       \*       \*       \*       \*       \*

19. At all times relevant hereto James Hedrick was a captain in the New Castle County Police and the investigation necessitated by the Defendants'

---

1. Gilmour has testified about Dr. Brenn's reaction. While there is no sworn testimony in the record from Dr. Brenn, it has been represented Dr. Brenn denies making the remark attributed to her. The Court has not mentioned specifics mostly because it is irrelevant to the issues raised in the current motion.

false report was performed by the New Castle County Police.

20. On the evening of October 22, 1998, James Hedrick was on his way home from a Chiefs of Police conference in Salt Lake City. During a layover in Cincinnati, Ohio, Col. Cunningham of the New Castle County Police was repeatedly paged from a number unknown to him, which James Hedrick identified as his wife's work number. When he finally reached his wife's shaken co-worker, he was advised that New Castle County Police Officers had taken his wife away because there was a problem with Jamie. When he reached the New Castle County Police, he was advised by Sgt. Kathleen Ridel that his eight year old daughter's urine had tested positive for sperm, which indicated sexual abuse. He was delayed in Cincinnati by a delayed flight which landed in Baltimore, more than a hour's drive from his home and family.

21. Exclusively as a result of Defendants' false report, James Hedrick was treated as a suspect and investigated by the very officers he supervised on a daily basis.[2]

## APPLICABLE STANDARD

To be entitled to summary judgment, the moving party must show there are no genuine issues of material fact and that it is entitled to it as a matter of law.[3] The record must be viewed in a light most favorable to the non-moving party.[4] If the moving party shows there are no genuine issues of material fact, the burden shifts to the non-moving party to show that there are.[5]

## DISCUSSION

In their complaint, plaintiffs make several different claims of negligence against Quest. They include that Quest did not follow certain standards handling, labeling, processing and retesting the urine sample. Plaintiffs, however, have presented no evidence to support any of these or their other claims of negligence. Instead, at oral argument, they said their interpretation of the Court's scheduling order did not allow them to develop any record about these claims.

The Court's scheduling order contained no such limitations. Plaintiffs' focus at oral argument was whether Quest's activities are protected by the immunity statute at issue. Those activities included analyzing the urine sample but only reporting the results to Jamie's doctor and no one in any governmental position. Quest's activities and the appropriateness of them are undisputed on this point so the issue becomes one of statutory construction. Further, if immunity applies, the negligence claims against Quest become moot.

The particular statute granting immunity provides:

Anyone participating in good faith in the making of a report or notifying police officers pursuant to this chapter, performing a medical examination without the consent of those responsible for the care, custody and control of a child pursuant to § 906(b)(5) of this title, or exercising emergency protective custody in compliance with § 907 of this title, shall have immunity from any liability, civil or criminal, that might otherwise

---

2. Plaintiffs' Complaint at 2, 3, 5.

3. *Bershad v. Curtiss–Wright Corp.*, 535 A.2d 840, 844 (Del.1987).

4. *Billops v. Magness Const. Co.*, 391 A.2d 196, 197 (Del.1978).

5. *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).

exist, and such immunity shall extend to participation in any judicial proceeding resulting from the above actions taken in good faith. This section shall not limit the liability of any health care provider for personal injury claims due to medical negligence that occurs as a result of any examination performed pursuant to § 906(b)(3) of this title.[6]

It is part of a statutory scheme in Title 16, Chapter 9, entitled "Abuse of Children." The first part of that scheme sets out its purpose:

> It is the intent of the General Assembly that the primary purpose of the child welfare policy of this State shall be to ensure the best interest and safety of the child, including preserving the family unit whenever the safety of the child is not jeopardized. To that end it is the purpose of this chapter to provide for comprehensive protective services for abused and neglected children by mandating that reports of such abuse or neglect be made to the appropriate authorities and by requiring the child protection system to seek and promote the safety of children who are the subject of such reports of abuse or neglect by conducting investigations or family assessments and providing necessary services.[7]

Within that statement is a reference to "mandating" reports of abuse of children. Another part of the statutory scheme sets up the requirements for making reports of abuse:

> Any physician, and any other person in the healing arts including any person licensed to render services in medicine, osteopathy, dentistry, any intern, resident, nurse, school employee, social worker, psychologist, medical examiner or any other person who knows or in good faith suspects child abuse or neglect shall make a report in accordance with § 904 of this title. In addition to and not in lieu of reporting to the Division of Family Services, any such person may also give oral or written notification of said knowledge or suspicion to an police officer who is in the presence of such person for the purpose of rendering assistance to the child in question or investigating the cause of the child's injuries or condition.[8]

The content and recipient of these reports is also specified.

> Any report required to be made under this chapter shall be made to the Division of Child Protective Services of the Department of Services for Children, Youth and Their Families. An immediate oral report shall be made by telephone or otherwise. Reports and the contents thereof including a written report, if requested, shall be made in accordance with the rules and regulations of the Division of Child Protective Services, or in accordance with the rules and regulations adopted by the Division.[9]

With the exception of this last section, the remaining provisions in Chapter 9 were rewritten in a comprehensive piece of legislation entitled, "Child Abuse Prevention Act of 1997."[10] The original bill covers sixteen pages and amends not only Chapter 9, "Abuse of Children," but other provisions in the *Delaware Code* related to the issue of child abuse and agencies dealing with this issue.

6. 16 *Del.C.* § 908.

7. 16 *Del.C.* § 901.

8. 16 *Del.C.* § 903.

9. 16 *Del.C.* § 904.

10. 71 *Del. Laws* Ch. 199. formerly Senate Bill 170, as amended.

■ There are a number of statutory interpretation maxims applicable to this Court's analysis of § 908, the immunity statute. The Court's role in interpreting a statute is to determine and give effect to the legislature's intent.[11] Where a statute is unambiguous and there is no reasonable doubt as to its meaning, the Court must give effect to its literal meaning.[12] Where, however, a word or phrase is ambiguous, the Court must construe the statute to ascertain the legislature's meaning.[13] If uncertainty exists, the statute must be viewed as a whole and the Court must seek to harmonize it and avoid mischievous or absurd results.[14] In ascertaining the meaning or intent of the legislature, the Court may refer to legislative history.[15]

Examination of § 908, in light of these principles of interpretation, reveals that it is not, at first blush, easily applied to the facts of this case. Further, parsing the language in § 908 reveals potential ambiguities and the possibility of an absurd result. These comments manifest themselves in the first few lines of the statute:

> Anyone participating in good faith in the making of a report or notifying police officers.... [16]

The phrase "or notifying police officers" was added to § 908 in 1999.[17] It, therefore, was not in the version of § 908 enacted in 1997 and was, obviously, not part of it in October 1998 when Quest tested the urine sample and notified Dr. Brenn. She did not notify the police, but, instead made a report to the Division's hotline as required by § 903. Because of the later addition of this language and to whom Dr. Brenn made her report, it is unnecessary to consider that phrase as part of this Court's opinion. The phrase at issue, therefore, is "Anyone participating in the making of a report."

As used in this chapter, the following terms mean:

\* \* \* \* \* \*

(11) "Report" shall mean the communication of an allegation of child abuse or neglect to the Division pursuant to § 903 or § 905 of this title.[18]

The record is also undisputed that Quest did not make any kind of report to the Division of Child Protective Services.

The definition of "report" refers to two other statutory provisions, § 903 and § 905. Section 903 [19] lists the occupations of those persons who know, or in good faith, suspect child abuse who are mandated to make a report to the Division. None of the employees of Quest fall within the list of occupations. Section § 905 [20] cre-

---

11. *Murphy v. Board of Pension Trustees*, 442 A.2d 950, 951 (Del.1982).

12. *Zimmerman v. State*, 628 A.2d 62, 68 (Del. 1993).

13. *Mosley v. Bank of Delaware*, 372 A.2d 178, 179 (Del.1977).

14. *Coastal Barge Corp. v. Coastal Zone Industrial Control Board*, 492 A.2d 1242, 1245 (Del. 1985).

15. *A & P Stores v. Hannigan*, 367 A.2d 641, 643 (Del.1976).

16. 16 *Del.C.* § 908.

17. 72 *Del. Laws* Ch. 179.

18. 16 *Del.C.* § 902.

19. *Supra* at 7.

20. (a) The Division shall establish and maintain a 24–hour statewide toll-free telephone report line operating at all times and capable of receiving reports of alleged abuse and neglect pursuant to § 904 of this title or from the public at large.
    (b) The Division shall maintain a central registry and an information system as defined by § 902 of this title. Reports unsubstantiated may be kept in the information system by the Division at its discretion.

ates a hotline for receiving abuse reports. It is undisputed, of course, that no one at Quest called the Division's child abuse hotline.

█ Despite not being immunized by these provisions, is Quest nevertheless protected because it participated in making a report?[21] Unlike other words in § 908 and elsewhere in Chapter 9, "participating" is not defined. It is found in the earlier version, which § 908 replaced, of the immunity statute which read:

Anyone participating in good faith in the making of a report pursuant to this chapter shall have immunity from any liability, civil or criminal, that might otherwise exist and such immunity shall extend to participation in any judicial proceeding resulting from such report.[22]

It was not a defined word in the earlier statute nor was it ever subjected to judicial interpretation. The legislative history concerning the replacement to that immunity provision, the current § 908, provides assistance to the meaning of "participating" and the intended breadth of the immunity provided by § 908.

Earlier, the Court noted that § 908 was part of comprehensive legislation enacted in 1997 concerning child abuse.[23] The enacted version of § 908, however, went through several iterations prior to final approval. The first version stated:

§ 908 Immunity from liability.

Any person, official, or institution making a report pursuant to this chapter, taking photographs and/or the making of examinations pursuant to an investigation, performing a medical examination without the consent of those responsible for the care, custody, and control of the child pursuant to § 905(5) of this chapter, removing or retaining a child pursuant to § 907 of this chapter, or cooperating with the Division, a law enforcement agency or the Family Court, in any of the activities authorized pursuant to § 905, shall have immunity from any liability, civil or criminal, which otherwise might result by reason of such actions. Any such person, official, or institution shall have the same immunity with respect to participation in any judicial proceeding resulting from the report; provided, however, that any person, official or institution who is shown by clear and convincing evidence to have intentionally filed a false report or acted in bad faith shall not have immunity from any liability, civil or criminal.[24]

---

(c) Although reports may be made anonymously, the Division shall in all cases, after obtaining relevant information regarding alleged abuse or neglect, request the name and address of any person making a report.

(d) Upon receipt of a report, the Division shall immediately communicate such report to its appropriate Division staff, after a check has been made with the information system to determine whether previous reports have been made regarding actual or suspected abuse or neglect of the subject child, or any reports regarding any siblings, family members or the alleged perpetrator and such information as may be contained in the information system shall also be forwarded to the appropriate Division staff. 16 *Del.C.* § 905.

**21.** Section 908 requires participation in good faith. "Good faith" is defined as meaning:

As used in this chapter, the following terms mean:

(7) "Good faith" shall be presumed in the absence of evidence of malice or willful misconduct.

16 *Del.C.* § 902. No where do plaintiffs contend that Quest did not act in good faith. That issue, therefore, need not be addressed in this case.

**22.** Formerly 16 *Del.C.* § 906.

**23.** *Supra* at 8.

**24.** Section 5, S.B. 170, 139th General Assembly at 10.

In this first iteration, the word "participating" did not appear. The scope of immunity is less broad, in some respects, therefore, than the immunity provision which was to be replaced. There are several reasons for this comment. The first is the removal of the phrase "participating in" found in former § 906. A second reason is that, linked with that removal, the immunity provided in the proposed language covered only those "making a report." The contact between the reporter and the report recipient had to be direct under the initial proposed immunity language.

Senator Tom Sharp, S.B. 170's primary sponsor, introduced Senate Amendment 1 to S.B. 170. It made a number of changes to the original bill. One change involved the immunity section which, as proposed, in the amendment, read:

> Anyone participating in good faith in the making of a report pursuant to this chapter, performing a medical examination without the consent of those responsible for the care, custody and control of a child pursuant to § 905(b)(5) of this chapter, or exercising emergency protective custody in compliance with § 907 of this chapter, shall have immunity from any liability, civil or criminal, that might otherwise exist and such immunity shall extend to participation in any judicial proceeding resulting from the above actions taken in good faith.[25]

There is a synopsis attached to S.A. 1 which explains many of the changes resulting from public hearings on S.B. 170. The synopsis states:

> This amendment makes various changes based on testimony and discussion at the Health and Social Services joint Committee Hearing. The amend-

ment makes it clear that the State's policy of preserving families will continue but that the child's health and safety will be paramount. To clear up ambiguity between the Division's registry and the information system, the amendment adds a definition for the Division's information system. The amendment also adds a definition for special investigators and makes clear that such persons will not have the power to unilaterally take custody of a child. The amendment mandates that the Division provide services during an investigation. In a effort to solicit input from the community, the amendment requires the newly created Child Protective Accountability Commission to report its findings and recommendations to the Governors Advisory Council on Children, Youth and their [sic] Families for their review and comment. Consistent with current law, the amendment creates a separate code section for the exception for treatment by spiritual means and also preserves the privilege between priest and penitent. Finally, the amendment limits the length of time a physician or police officer can exercise emergency protective custody from 24 hours to 4 hours.[26]

There is no specific reference in this synopsis to the reasons behind the amended immunity provision. Based on this synopsis, however, it is reasonable to conclude that comments were made which prompted the change.

S.A. 1 restored the language "participating in . . . the making of a report." This reestablished the original phraseology then existing in § 906 and broadened the immunity coverage since, unlike the original wording in S.B. 170, the immunity was not confined to those making the report itself.

---

25. S.A. 1 to S.B. 170, 139th General Assembly at 3.

26. *Id.* at 4–5.

It is important to note also that a qualifier to that broadened immunity found in § 906 was reinserted; namely, that the participation be "in good faith." These words were not defined in the 1997 legislation. Their definition was added in 1999.[27]

But S.A. 1 was not the final iteration of the immunity provision which was enacted. That was done in S.A. 2 to S.B. 170 and provided:

> Anyone participating in good faith in the making of a report pursuant to this chapter, performing a medical examination without the consent of those responsible for the care, custody and control of a child pursuant to § 906(b)(5) of this chapter, or exercising emergency protective custody in compliance with § 907 of this chapter, shall have immunity from any liability, civil or criminal, that might otherwise exist and such immunity shall extend to participation in any judicial proceeding resulting from the above actions taken in good faith. This section shall not limit the liability of any health care provider for personal injury claims due to medical negligence that occurs as a result of any examination performed pursuant to this [sic] 906(b)3 [sic] of this Title.[28]

There is a synopsis to this amendment which provides:

> It is the intent of Section 908 to limit the liability of any health care provider for the report that may generate following an examination of the patient. This amendment makes it clear that the health care provider is not immune from a tort claim if the provider injures the patient during the course of the exam. The amendment also makes a technical correction.[29]

The technical revision referred to in S.A. 2 is that in S.A. 1's version, the statutory citation was to § 905(b)(5). There was no such section in S.B. 170. S.A. 2 correctly changed that to § 906(b)(5). There was new language in this second amendment which had not been in the prior law or any of the proposed new immunity provisions. That new language related to not immunizing health care providers negligently injuring patients while performing examinations conducted under the provisions of another section of the statute.

Regrettably, the statutory citation in S.A. 2 to medical examinations conducted pursuant to § 906(b)(3) is itself a technical error. That section does not address medical examinations. Section 906(b)(5) does, however.[30] While it is important to note this technical error, it has no direct role in this case. Quest performed no test or examination under either §§ 906(b)(3) or (5).

It is this exception to the initial grant of immunity which makes § 908 a qualified immunity. But, even with that qualification, the breadth of the immunity which is granted is broad. It is broad because of the phrase, "Anyone participating . . . in the making of a report." This is a broader grant of immunity than the original S.B.

---

27. 72 *Del. Laws* Ch. 179.

28. S.A. 2 to S.B. 170, 139th General Assembly.

29. *Id.*

30. The Division shall have authority to secure a medical examination of a child, without the consent of those responsible for the care, custody and control of the child, if the child has been reported to be a victim of abuse or neglect; provided, that such case is classified as an investigation pursuant to § 906(b)(3) of this title and the Director or the Director's designee give prior authorization for such examination upon finding that such examination is necessary to protect the health and safety of the child. 16 *Del. C.* § 906(b)(5).

170 language covering only those making the report. Under that language, there could be a rational argument that Quest would not be immunized, since it did not *make* the report.

But, it was a participant. It reported its findings to Dr. Brenn who made the report to the appropriate authorities mandated by statute. When § 908 is viewed in the context of the strongly-worded statement of legislative intent in § 901, a broad reading must be given to the grant of immunity. Not only is the statutory language strongly worded, the accompanying synopsis in S.B. 170 reaffirms the General Assembly's intent.[31]

The legislature's eventual choice of the words "Anyone participating in" is a reflection of current medical practice and reality. While doctors, dentists and other professionals are specifically identified as those who must report abuse,[32] the category of those immunized is not so confined. To put it another way, immunity is not granted to just those statutorily-listed persons in § 903 but to anyone participating in the making of a report to the Division. The fact that the General Assembly, in enacting § 908, made such a choice in granting immunity is another indication of the intent to make that grant broad. The difference between § 903 and § 908 cannot be viewed as an oversight.[33] The legislature is presumed to have used these differ-

ent provisions for different reasons and intended a distinction.[34]

In addition to these rules of construction, the facts of this case are a good example of current medical practice and the legislature's recognition of it in the wording of § 908. Doctors utilize outside entities, laboratories, imaging centers, etc., to perform specialized tests as an integral aid in diagnosing and treating patients. Laboratories such as Quest are part of the medical team. Dr. Brenn originally solicited analytical help because of a suspected urinary tract infection. Quest was brought into the diagnosis/treatment continuum in a routine way.[35] Dr. Brenn needed the analysis for her diagnosis and treatment of Jamie. Quest, in turn, did the logical and usual thing. As with any abnormal result, it contacted the treating physician who had ordered the original test.

It would be illogical, therefore, and absurd to attribute to the General Assembly an intent to immunize Dr. Brenn who made the report but open Quest to liability, since it did not make the report itself. A primary intent of this or similar immunity provisions is to encourage the reporting of child abuse and not place an undue chill on the willingness to do so.[36] As noted earlier, courts should avoid interpreting statutes in a way that would lead to an

---

31. This legislation represents the most sweeping changes in Delaware's Child Protection Services System since its inception. The overriding goal of this legislation is to make clear that child safety is the primary focus of Delaware's response to child abuse and neglect. In so doing, the legislation clearly establishes the best interest of the child as the child welfare policy for the State of Delaware.

   S.B. 170, 139th General Assembly, at 16.

32. 16 *Del.C.* § 903.

33. *Giuricich v. Emtrol Corp.,* 449 A.2d 232, 238 (Del.1982).

34. *C & T Associates v. Government of New Castle County,* 408 A.2d 27, 29 (Del.Ch.1979).

35. That statement does not mean that if Jamie's urine sample had been forwarded to Quest to "rule out" the presence of sperm, the result of this case would be different.

36. *Maples v. Siddiqui,* 450 N.W.2d 529, 530 (Iowa 1990).

unreasonable or absurd result.[37]

There is another principle of statutory construction which points to Quest's immunity. The Court noted earlier that "participating" is not a defined word.[38] Where undefined words are used in a statute, they are construed according to their common and approved usage.[39] Participate has been defined to include "to ... have a part ... of; as to 'participate' in a discussion."[40] "Participate" has been defined as to "take part" or "share in something;"[41] "to take part in something usually in common with others."[42] "Participating" is also defined as, "involving participation by more than one person or agency."[43]

Even though no person at Quest made the report to the Division, it was involved. Personnel at Quest knew and appreciated their findings of sperm in the urine sample. That finding, of course, was unrelated to the analysis for potential infection. By informing Dr. Brenn of its findings, Quest was involved with another and that other was the person mandated to make the report. Dr. Brenn could not have made the report without Quest's report. That is not to fault Quest but to emphasize the collaborative effort in doctor/laboratory common effort in diagnosis and treatment.

"In many instances, the discovery of child abuse will be a collaborative event."[44]

This Court's application of § 908 to immunize Quest is supported by decisions in other jurisdictions. *William M. v. B. Laub*[45] found immunity for a polygraph operator who did not make the report but assisted in the investigation. New York's statute provides immunity to persons participating in providing investigative services.[46] In *Nosbaum v. Martini*,[47] immunity under Illinois' law was extended to a doctor who was not the reporting person. The doctor's examination, with apparent abnormal findings, was included in a report to a social worker who made the abuse report to authorities.

The Court's research into immunity provisions in other states reveals no contrary result. It is interesting to note that despite the emphasis in all states on protecting children from abuse and the strong desire to encourage reporting it, the immunity provisions are anything but uniform.[48] Those provisions, including the one finally enacted, clearly reflect various competing policy/interests and compromises reached in an effort to reconcile those interests. One such interest in Delaware, and those decisions interpreting immunity·provisions in other states the Court has examined, which is not given much weight is a reme-

37. *Snell v. Engineered Systems & Designs, Inc.*, 669 A.2d 13, 20 (Del.1995).

38. *Supra* at 11.

39. *Moore v. Wilmington Housing Auth.*, 619 A.2d 1166, 1173 (Del.1993).

40. Black's Law Dictionary 6th Ed. at 1118.

41. Webster's Ninth New Collegiate Dictionary at 835.

42. Webster's Third New International Dictionary at 1646.

43. *Id.*

44. *Storch v. Silverman*, 186 Cal.App.3d 671, 681, 231 Cal.Rptr. 27 (1986).

45. 149 A.D.2d 475, 539 N.Y.S.2d 970 (1989).

46. *Id.*

47. 312 Ill.App.3d 108, 244 Ill.Dec. 488, 726 N.E.2d 84 (2000).

48. *See, e.g., Surdel v. MetroHealth Medical Ctr.*, 135 Ohio App.3d 141, 733 N.E.2d 281 (1999); *May v. Southeast Wyoming Mental Health Ctr.*, 866 P.2d 732 (Wyo.1993); *Krikorian v. Barry*, 196 Cal.App.3d 1211, 242 Cal. Rptr. 312 (1987); *Nosbaum v. Martini*, 726 N.E.2d 84 (Ill.App.Ct.2000).

dy for those, such as the adult plaintiffs here, falsely accused. It is the role of the General Assembly to make such policy decisions and resolve such competing interests. It has done so in unmistakable fashion.

### CONCLUSION

For the reasons stated herein, the summary judgment motion of defendant Quest Diagnostics Clinical Laboratories, Inc. is **GRANTED.**