**DIVISION OF FAMILY SERVICES,**
Petitioner,

v.

**Juanita PADDINGTON and Richard
Mason, Respondents.**

No. CN02–08448.

Family Court of Delaware,
New Castle County.

Submitted: April 1, 2003.
Decided: April 23, 2003.

Michael L. Ripple, Esquire, Deputy Attorney General, Department of Justice, for Petitioner.

Darryl J. Rago, Esquire, Law Office of Richard F. Rago, Wilmington, Delaware, for Juanita Paddington.

James R. Adams, Esquire, Townsend, Delaware, for Richard Mason.

C. Michael Cochran, IV, Esquire, Richards, Layton & Finger, Wilmington, Delaware, Attorney Guardian ad Litem.

CROWELL, Associate Judge.

### DECISION AND ORDER ON MOTION FOR NO REASONABLE EFFORTS

This is the Court's decision on the Motion For No Reasonable Efforts filed by the Division of Family Services (DFS) in regard to two pending dependency petitions filed by DFS against Juanita Pad-

dington (Mother) and Richard Mason (Father) related to their daughters, Theresa (d.o.b. 9/16/01) and Joyce (d.o.b. 12/1/02).[1] A hearing on this motion was held on March 6, 2003, at which time this Court denied DFS' motion on the alleged grounds that Mother's parental rights in a sibling had been involuntarily terminated. The reasons for the decision were stated on the record and set forth in this Court's decision and order dated March 11, 2003. On March 21, 2003, DFS and the Attorney Guardian *ad Litem* submitted memoranda in support of the motion on the basis that Mother had abandoned Theresa. On or about that same date, Mother filed a memorandum in opposition. All three parties filed answering memoranda on April 1, 2003.

### Background Facts

Theresa came into the care of DFS on June 25, 2002, following a domestic incident between Mother and Father. Mother was charged with endangering the welfare of a child and Father was charged with assault against Mother. A no-contact order against Mother in regard to Theresa was entered as a condition of Mother's bail. At the Adjudicatory Hearing on July 30, 2002, which both parents attended, the no-contact order still was in effect between Mother and Theresa, and Father was found to be unemployed, had no stable housing, and most importantly, had failed to contact DFS for one month in regard to Theresa. The Court found Theresa to be dependent at that time and she was placed in a Children's Choice foster home.

A month and a half later, at the time of the Dispositional Hearing on September 11, 2002, which Mother attended but Father did not, the no-contact order between Mother and Theresa was still in effect although DFS was in support of modifying the "no-contact" order to "no unlawful contact," in order to facilitate visitation between Mother and Theresa. The Court later heard testimony that, at the conclusion of the hearing on September 11, 2002, the DFS attorney, the DFS worker and the Attorney Guardian *ad Litem* together urged Mother to deal with an outstanding capias and to file a motion to modify the no-contact order. Mother apparently indicated that she wanted to go home instead and left the courtroom. She was stopped in front of the courthouse and persuaded to come back and turn herself in. A bail modification hearing was held before Commissioner Grillo who changed the "no-contact" order to a "no unlawful contact" order.

Mother was encouraged to contact the Children's Choice social worker, Natalie Naccasha, to arrange visits with her daughter. A number of visits were scheduled but Mother never showed up. DFS did not hear again from Mother until December 10, 2002, nine days after little Joyce was born. Joyce was born positive to cocaine and came into the DFS' care two days after her birth. On December 10, 2002, Mother called the DFS worker to request transportation to attend the Preliminary Protective Hearing in Family Court for Joyce and a Review Hearing for Theresa both scheduled for a consolidated hearing two days later on December 12, 2002. The DFS worker reportedly went to Mother's home and left bus tickets for her to attend the hearing but she failed to show. On January 2, 2003, Mother called the DFS worker and a visit was arranged for January 6, 2003, but Mother again failed to show for the visit. Mother finally visited with Joyce on February 12, 2003, with Theresa on February 20, 2003, and again with Joyce on February 27, 2003.

The family who adopted Nadine (d.o.b. 4/3/90), Theresa's and Joyce's older half-

---

1. The Court has assigned pseudonyms to the parties and children in this case.

sister, is willing to adopt Theresa. Mother testified that she has been working at ShopRite for the last two weeks since February 26, 2003, twenty hours a week, but anticipated that her hours would increase. She was recently evaluated at Connections for substance abuse and has begun treatment, attending one group counseling session and one educational group meeting in the past few weeks.

### Reasonable Efforts to Reunify

■ When a child is removed from his or her home by DFS and placed in foster care, federal and state laws generally require that DFS make reasonable efforts to reunify the family. *See* 42 *U.S.C.A.* § 671(a)(15); 29 *Del. C.*, Chapter 90; *In the Matter of Derek W. Burns*, 519 A.2d 638, 647–648 (Del.1986). Thirteen *Del. C.* § 1103(d) [2] provides, however, that DFS is not required to make reasonable efforts to reunify a family if it is established, among other reasons, that a child has been abandoned pursuant to 13 *Del. C.* § 1103(a)(2) [3] or that the parent's parental rights in a sibling of the child in the dependency action had been involuntarily terminated in a

---

**2.** 13 *Del. C.* § 1103(d) states:

The Department is not required to perform, but is not prohibited from performing, reunification and related services as outlined in Chapter 90 of Title 29 when the grounds for termination of parental rights are those stated in subsections (a)(2), (4), (6), (7) or (8) of this section.

**3.** § 1103. Grounds for termination of parental rights.

(a) The procedure for termination of parental rights for the purpose of adoption or, if a suitable adoption plan cannot be effected, for the purpose of providing for the care of the child by some other plan which may or may not contemplate the continued possibility of eventual adoption, may be initiated whenever it appears to be in the child's best interest and that 1 or more of the following grounds exist:

. . . .

(2) The child has been abandoned.

a. The Court may order a termination of parental rights based upon abandonment if the Court finds that the following occurred and that the respondent intended to abandon the child:

1. In the case of a minor who has not attained 6 months of age at the time a petition for termination of parental rights has been filed, and for whom the respondent has failed to:

A. Pay reasonable prenatal, natal and postnatal expenses in accordance with the respondent's financial means;

B. Visit regularly with the minor; and

C. Manifest an ability and willingness to assume legal and physical custody of the minor, if, during this time, the minor was not in the physical custody of the other parent;

2. In the case of a minor who has attained 6 months of age at the time a petition for termination of parental rights is filed, the respondent, for a period of at least 6 consecutive months in the year preceding the filing of the petition, has failed to:

A. Communicate or visit regularly with the minor; and

B. Manifest an ability and willingness to assume legal and physical custody of the minor, if, during this time, the minor was not in the physical custody of the other parent; or

3. In the case of a minor who has not attained 6 months of age at the time a petition for termination of parental rights has been filed, and for whom the respondent has manifested the unwillingness to exercise parental rights and responsibilities, as evidenced by the respondent's placing the minor in circumstances which leave the minor in substantial risk of injury or death.

b. In cases in which no finding of intent to abandon has been made, the Court may order a termination of parental rights based upon abandonment if the Court finds that the respondent, for a period of at least 12 consecutive months in the 18 months preceding the filing of the petition, has failed to:

1. Communicate or visit regularly with the minor;

2. File or pursue a pending petition to establish paternity or to establish a right to have contact or visitation with the minor; and

3. Manifest an ability and willingness to assume legal and physical custody of the

prior proceeding pursuant to § 1103(a)(6).[4] As set forth in a decision dated March 11, 2003, this judge found that, while the parents' parental rights may have been technically terminated on other or additional grounds, the evidence established that Mother believed she had voluntarily consented to the termination of her parental rights in regard to the children's sibling, Nadine. Since Mother voluntarily gave up her rights in Theresa's and Joyce's sibling, this Court declined to find DFS was relieved of making reasonable efforts to reunify on the basis that the termination had not been voluntary.

In its written memoranda, DFS argued that it should not be required to make reasonable efforts to reunify Mother with Theresa on the basis that Mother had abandoned Theresa. Thirteen *Del. C.* § 1103(a)(2), which became effective on July 12, 2001, provides for two different situations when a child can be found to have been abandoned: (1) 13 *Del. C.* § 1103(a)(2)a. sets forth the factors to be established in situations when the Court finds the respondent intended to abandon the child, and (2) 13 *Del. C.* § 1103(a)(2)b. describes the necessary elements in the event the Court finds the parent had no intent to abandon the child. If the Court fails to find an intent to abandon, the necessary lack of interaction between the parent and the child to prove abandonment must have occurred over a period of at least twelve consecutive months during the eighteen months preceding the filing of the petition. DFS concedes that, since Theresa has only been in the custody of DFS since June 25, 2003, insufficient time has passed for the Court to make a finding of abandonment under 13 *Del. C.* § 1103(a)(2)b. Therefore, the only basis on which DFS can be successful with its motion is if it can establish that Theresa has been abandoned pursuant to 13 *Del. C.*

minor, if during this time, the minor was not in the physical custody of the parent; and if the Court finds that one of the following grounds exists:

1. If the minor is not in the legal and physical custody of the other parent, the respondent is not able or willing promptly to assume legal and physical custody of the minor, and to pay for the minor's support, in accordance with the respondent's financial means;

2. If the minor is in the legal and physical custody of the other parent and a stepparent, and the stepparent is the prospective adoptive parent, the respondent is not able or willing promptly to establish and maintain contact with the minor and to pay for the minor's support, in accordance with the respondent's financial means;

3. Placing the minor in the respondent's legal and physical custody would pose a risk of substantial harm to the physical or psychological well-being of the minor because the circumstances of the minor's conception, the respondent's behavior during the mother's pregnancy or since the minor's birth, or the respondent's behavior with respect to other minors, indicates that the respondent is unfit to maintain a relationship of parent and child with the minor; or

4. Failure to terminate would be detrimental to the minor. In determining whether a failure to termination would be detrimental to the minor, the court shall consider any relevant factor, including the respondent's efforts to obtain or maintain legal and physical custody of the minor, the role of other persons in thwarting the respondent's efforts to assert parental rights, the respondent's ability to care for the minor, the age of the minor, the quality of any previous relationship between the respondent and the minor and between the respondent and any other minor children, the duration and suitability of the minor's present custodial environment and the effect of a change of physical custody on the minor.

c. The respondent's act of abandonment cannot be cured by subsequent conduct.

4. 13 *Del. C.* § 1103(a)(6) states:

(6) The respondent's parental rights over a sibling of the child who is the subject of the petition have been involuntarily terminated in a prior proceeding.

§ 1103(a)(2)a. requiring proof that Mother intended to abandon her.

### Mother's Intent to Abandon

DFS and the attorney guardian *ad litem* essentially argue that Mother's lack of contact with Theresa and failure to comply with her treatment plan are sufficient, in and of themselves, for the Court to find that Mother intended to abandon Theresa. Mother, on the other hand, argues that she never intended to abandon her daughter and that her lack of visitation and her failure to comply with the case plan are insufficient to establish that she intended to abandon Theresa, which would justify DFS to no longer make reasonable efforts for reunification. Thus, the issue before the Court is how to interpret the language in 13 *Del. C.* § 1103(a)(2)a. which requires a finding that Mother "intended to abandon the child." That is, does the Court look to Mother's subjective intent to abandon the child or, as DFS and the attorney guardian *ad litem* argue, may the Court find that Mother intended to abandon the child based objectively on Mother's conduct, even if she had no subjective intent to do so?

■■■ A fundamental rule of statutory construction when faced with an ambiguous statute is to ascertain and give effect to the legislative intent by looking to the statute as a whole and seeking to harmonize the provision in question within other parts or sections of the statute. *See, Coastal Barge Corp. v. Coastal Zone Indus. Bd.*, 492 A.2d 1242, 1245–1246 (Del. 1985); *Murphy v. Bd. of Pension Trs.*, 442 A.2d 950, 951 (Del.1982); *Hedrick v. Quest Diagnostics Clinical Labs., Inc.*, 807 A.2d 584, 589 (Del.Super.Ct.2002). Faced with two possible interpretations of a statute, one of which would lead to an unreasonable result, the Court should reject that interpretation in favor of the other con-

struction which produces a reasonable result. *See, Coastal Barge Corp.*, 492 A.2d at 1247; 2A Sutherland *Statutes and Statutory Construction* § 45.12 (6th ed.2000).

■■ To hold that a parent "intended to abandon" a child based on a parent's failure to communicate or visit regularly with the child would render meaningless the requirement of § 1103(a)(2)a. that, *in addition to* failing to communicate or visit regularly with the child, a finding must be made that the child intended to abandon the child. Furthermore, if the General Assembly had meant the "intended to abandon" language in § 1103(a)2a.2 to include a situation when a parent does not subjectively intend to abandon the child but fails to communicate or visit regularly with the child for a period of six months (as required for a child older than six months), there would be no need for the language of § 1103(a)(2)b., providing that abandonment can be established when there is no intent to abandon, but the parents have had no regular communication with the child for a period of at least twelve consecutive months in the prior eighteen months. This Court will not interpret the statute to have a meaningless provision. *See, In re Adoption of Swanson*, 623 A.2d 1095, 1099 (Del.1993); *Murphy*, 442 A.2d at 951 (Del.1982). Reading § 1103(a)(2)a. in conjunction with § 1103(a)(2)b., this Court concludes that, to make a finding of intent to abandon, a court must find that the parent had a subjective intent to abandon the child. Such a holding, of course, does not preclude considering a parent's conduct in trying to ascertain that parent's subjective intent, but the critical question is the subjective intent of the parent.

In the case before this Court, it is undisputed that Mother failed to communicate regularly with Theresa. Initially, a no-contact order was in place but after Sep-

tember 11, 2002, Mother was permitted to have supervised visits with Theresa. It is not contested that Mother did make arrangements for visitation and that she never followed through on the scheduled visits until February, 2003. Moreover, she has failed to manifest an ability to assume legal physical custody of Theresa. She has only recently begun to comply with elements of her case plan. DFS and the attorney guardian *ad litem* argue that her failure to follow through with the visits and to comply with her case plan demonstrate that she intended to abandon Theresa. Mother asserts that her substance abuse prevented her from visiting Theresa and following her case plan. Such facts are similar to cases where parents are found to have failed to plan for their child under 13 *Del. C.* § 1103(a)(5). Under such circumstances, DFS *is* required to make reasonable efforts to reunify the family by making available to the parents services to address the issues that have prevented the parents from appropriately caring for their child.

Based on the evidence presented in this case, especially Mother's agreement to have visitation and calls to arrange transportation for court hearings about her daughters, even if she failed to follow through, this judge finds that Mother did not subjectively intend to abandon Theresa. It was her substance abuse issues, not an intent to abandon Theresa, that kept her from communicating with and visiting Theresa. The attorney guardian *ad litem* recites Mother's long sad history and describes the loving home in which Theresa has been placed. While those facts may be true, they do not absolve DFS of the legal obligation to make reasonable efforts with Mother to reunify her with Theresa.

Thus, DFS' motion for no reasonable efforts with Mother is denied. Any modifications to Mother's reunification plan will be considered at the next hearing scheduled for April 24, 2003 at 2:00 p.m.

### *Father's Intent to Abandon*

Because the Court only learned at the time of the last hearing that Father had recently been incarcerated, no arrangements were made to bring Father to the courthouse for the hearing on March 6, 2003 on DFS' motion. Therefore, the Court continued the hearing on DFS' motion in regard to Father. That issue will be heard at the upcoming hearing on April 24, 2003.

Genetic testing to determine whether Richard Mason is the father of the Theresa and Joyce shall go forward, if it has not already been done.

**IT IS SO ORDERED.**